# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF WISCONSIN

ELIZABETH BERRIOS,
JACQUELINE MACHADO,
LILIAN PAGUADA ,
CINDY TEJEDA,
CECILIA SIERRA,

        Plaintiffs,

    v.                             Case No.  15-C-0536

MARCUS HOTELS INC.,

        Defendant.

## ORDER GRANTING DEFENDANT'S MOTION FOR
## SUMMARY JUDGMENT (DOC. 24) AND DISMISSING CASE

Plaintiffs walked off their jobs in the Housekeeping Department of the Madison Hilton on August 31, 2012.  Six days later, defendant terminated their employment. Afterward, plaintiffs brought this action asserting that they were constructively discharged and retaliated against in violation of 42 U.S.C. § 1981 based on their race and national origin (Hispanic/Latina).  As the case progressed, plaintiffs filed a motion for voluntary dismissal—with prejudice—"of all claims asserted under Title VII of the Civil  Rights Act of 1964, 42 U.S.C. § 2000e, et seq." (Doc. 22.) The motion was granted.  Defendant has since moved for summary judgment on the constructive discharge claim, and any remaining retaliation claim.  Because plaintiffs have not created a genuine issue of material fact with admissible evidence, defendant's motion for summary judgment will be granted.

Summary judgment is proper where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). While all facts and reasonable inferences are to be construed in favor of the nonmoving party, *South v. Ill. EPA*, 495 F.3d 747, 751 (7th Cir. 2007), "[i]nferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." *McDonald v. Vill. of Winnetka*, 371 F.3d 992, 1001 (7th Cir. 2004).

Before turning to the court's findings of fact, the court notes that the plaintiffs submitted numerous proposed findings of fact that have been rejected because they were not supported by evidence in the record. After thoroughly reviewing the parties' submissions and citations to the record, the court found that plaintiffs failed to include evidentiary support for their proposed findings. For example, plaintiffs' first proposed finding cites to pages 19-20 in Cindy Tejeda's deposition transcript. However, pages 15-18, 27-34, 55-62, 67-74, and 79-82 were provided. The court even looked to defendant's submissions to determine whether the relevant pages existed in the record but was not successful. In numerous instances, plaintiffs failed to include the evidence in the record or otherwise cited to deposition testimony that did not directly support the proposed finding. Therefore, on February 11, 2016, this court warned plaintiffs that it would not consider any proposed findings for which there was no evidentiary support and ordered that all supporting documents be filed on or before February 18, 2016. Yet plaintiffs did not comply. As a result, the court has only considered facts that are unopposed or supported by the record in accordance with Rules 56(c) and 56(e).

2

## FINDINGS OF FACT

Defendant Marcus Hotels is comprised of a theater division and a hotel and resort division. The hotel and resort division operates 18 hotels and resorts nationally, including the Madison Hilton. (Doc. 18, ¶ 1.) Plaintiffs worked in the Housekeeping Department of the Madison Hilton. (Doc. 18, ¶¶ 2-6.)

Plaintiffs Elizabeth Berrios, Jacqueline Machado, and Cecilia Serra are of Mexican ancestry. (Doc. 18, ¶¶ 2, 3, 5.) Plaintiffs Lilian Paguada and Cindy Tejeda are of Honduran ancestry. (Doc. 18, ¶¶ 4, 6.) Berrios worked in the Housekeeping Department from March 18, 2009, to September 4, 2012; Machado worked from March 1, 2010, to September 4, 2012; and Sierra worked from 2006 to September 4, 2012. (Doc. 18, ¶¶ 2, 3, 5.) Paguada worked in the same department from May 1, 2009, to September 4, 2012, while Tejeda began on March 29, 2010. (*Id.*)

Throughout plaintiffs' employment, the Housekeeping Department of the Madison Hilton had 30 employees, 90% of whom were Hispanic. (Murray Aff. Ex. 2, Hinton Dep. 35, 68.) The managers of this department also were Hispanic. Abigail Vasquez, the Housekeeping Manager, and Ana Laura Resendiz, one of the Supervisors who reported to Vasquez, are of Mexican ancestry. (Murray Aff. Ex. 2, Hinton Dep. 36; Murray Aff. Ex. 9, Vasquez Dep. 4; Murray Aff. Ex. 6, Resendiz Dep. 30, 34.)

Each of the plaintiffs received copies of the Marcus Associate Handbook during their employment, which is available in English and Spanish. (Murray Aff. Exs. 16-17, 28-32.) At all relevant times, the Marcus Hotels Associate Handbook had a Harassment Free Workplace Policy which states:

> Marcus Hotels & Resorts is committed to providing its associates with a
> work environment free from any form of harassment. In order to promote a

3

respectful and professional workplace environment, Marcus Hotels & Resorts does not tolerate harassment of our associates on any basis prohibited by law, including race, color, gender, age, religion, national origin, sexual orientation, disability or military status.

Harassment can include such behavior as slurs, demeaning jokes or comments, innuendoes, unwelcome compliments, cartoons, pictures, e-mail, pranks, hazing, stereotypical comments, derogatory descriptions or other verbal or physical conduct. Such behavior is considered harassment when it has the purpose or effect of creating an intimidating, hostile, or offensive working environment, unreasonably interferes with an individual's work performance, or affects an individual's workplace opportunities.

Sexual harassment is a type of harassment that occurs when the verbal or physical conduct described above is sexual or gender-based in nature and creates an intimidating, offensive, or hostile work environment. Sexual harassment can also involve making unwelcome sexual advances or requests for sexual favors, or making submission to or rejection of such requests the basis for employment decisions.

Marcus Hotels & Resorts strongly encourages the prompt reporting of all incidents of harassment in the workplace. Any associate who witnesses harassment or believes that he or she has been the subject of unwelcome harassment whether by a manager, co-worker or other third-party such as a guest or vendor, is encouraged to identify the offensive behavior and request that it stop. If you are unable to address the matter directly with the harasser, or if you do and the behavior continues, please report the matter to one of the following individuals:

- · Your Department Head
- · Your Human Resources Department
- · Your General Manager
- · The Corporate Divisional Director of Human Resources at (414) 905-1000
- · Marcus Confidential Line (877) 622-7536

All complaints will be investigated promptly, impartially, and discreetly. Upon completion of the investigation, the appropriate parties will be notified of the findings. If any associate is found by the company to have harassed another associate or retaliated against an associate for reporting a violation of this policy, appropriate corrective action will be taken. This could range from a disciplinary warning up to termination of employment.

No associate will suffer retaliation for reporting incidents that you believe in good faith to be violations of this policy. Marcus Hotels & Resorts considers retaliation to be a serious violation of this policy and urges you to report any

4

incidents of retaliation immediately as you would any act of harassment. Marcus Hotels & Resorts will investigate and resolve reports of retaliation in the same manner as reports of harassment.

Associates and management must work together to prevent and stop harassing conduct in the workplace. We trust that Marcus Hotels & Resorts associates will act responsibly while at work, will treat each other with dignity and respect, and will work to maintain a workplace free of discrimination and harassment.

Additionally, the Associate Handbook includes an Equal Employment Opportunity

Policy which states:

It is the policy of Marcus Hotels & Resorts to provide equal employment opportunity to all associates and applicants for employment and not to discriminate on the basis of race, color, gender, age, religion, national origin, sexual orientation, disability, military status, or any other status that is protected by applicable local, state or federal laws. It is our intent and desire that equal employment opportunities will be provided in employment, recruitment, selection, compensation, benefits, promotion, demotion, layoff, termination and all other terms and conditions of employment. All managerial personnel are committed to this policy and its enforcement.

Associates are directed to bring any violation of this policy to the immediate attention of their manager or the Human Resources Department. Any associate who violates this policy or knowingly retaliates against an associate reporting or complaining of a violation of this policy shall be subject to disciplinary action, up to and including termination. Complaints brought under this policy will be promptly investigated and handled with due respect of all involved.

(Doc. 18, ¶¶ 12, 13.)

Marcus Hotels' Associate Handbook includes an Open Door Policy which allows

employees to raise concerns about their workplace with their Immediate Manager,

Department Head, Executive Committee Member, Human Resources representative,

General Manager, Vice President of Operations, or the President of the Division:

Marcus Hotels & Resorts believes that all of its associates have a right to voice problems, concerns, or suggestions they may have regarding their workplace. Every associate is encouraged to bring any question, complaint, concern or idea they may have to his or her manager. While the company

may not be able to correct every problem or concern brought to its attention, it is our desire to listen to our associates and to respond appropriately to all legitimate concerns. By keeping our doors open to you, we hope to prevent issues or frustrations from diminishing your spirit for the job.

Most of the time an associate's immediate manager is the person best qualified to solve workplace issues. If you feel that an issue is not being addressed in an appropriate manner, we encourage you to contact the following individuals, in this order, to address your concerns:

- Immediate Manager
- Department Head
- Executive Committee Member
- Human Resources representative
- General Manager
- Vice President of Operations
- President of Division

While the above steps are recommended, if an associate feels uncomfortable following this progression, they may contact anyone at any stage. An associate may also contact the Marcus Hotels & Resorts Divisional Director of Human Resources at (414) 905-1000.

There will be no retaliation against any associate because he or she uses the Open Door Policy. We are on the same team, and by working together we can continue to improve our ability to provide excellent service to our guests.

(Murray Aff. Ex. 16 at 8.)

For those uncomfortable with the steps outlined above, the Associate Handbook

includes specific information about Marcus Hotels Confidential Line:

Marcus Confidential Line

It is important to remember that your first line of communication should be with your manager or the individuals listed in the Open Door Policy. If your attempts to utilize the Open Door Policy are not successful and/or you do not feel comfortable utilizing this process, the company offers a special phone line entitled the Marcus Confidential Line. You can call the toll-free number 24 hours a day, 365 days a year. Reasons for calling the Marcus Confidential Line may include:

- Mistreatment or harassment of associates or guests
- Issues of theft or misappropriation of company resources

6

· Violation of laws or regulations
· Violations of Marcus Hotels & Resorts Handbook or Code of Conduct
· Internal problems that affect you or other associates and/or guests

The Marcus Confidential Line's toll-free number is:

1-877-622-7536

To assist in achieving a resolution, you may be asked to provide your name and contact information. However, any issues addressed through the Marcus Confidential Line will be kept confidential until we have had the opportunity to speak with you regarding your concerns. There will be no retaliation against any associate because he or she uses the Marcus Confidential Line.

(Murray Aff. Ex. 16 at 9.)

During the summer of 2012, the Housekeeping Department of the Madison Hilton included one male Hindu employee and two female American employees. (Murray Aff. Ex. 1, Berrios Dep. 58; Murray Aff. Ex. 2, Hinton Dep. 68.) The male Hindu employee, Tenzin, and the two American employees, Krisha King and Mercedee Steen, began working in the Housekeeping Department in July of 2012.[1] (Murray Aff. Ex. 1, Berrios Dep. 65; 67; Murray Aff. Ex. 20.) As new employees, Tenzin, King and Steen were paired to work with more experienced members of the Housekeeping Department. (Murray Aff. Ex. 1, Berrios Dep. 65; 67.) Tenzin, King and Steen were short-term employees whose employment ended prior to August 17, 2012. (Murray Aff. Exs. 21-24; Murray Aff. Ex. 1, Berrios Dep. 75; Murray Aff. Ex. 9, Vasquez Dep. 74.)

Paguada testified that Vasquez would tell her to work faster but would not say the same thing to her non-Hispanic coworkers. Vasquez denied Paguada's and other

---

[1]The plaintiffs have not identified the race or ethnicity of the Hindu or American employees.

Hispanics' requests for time off but granted an American's request to take a week off. Paguada complained to Bridget Hinton, the Area Director of Human Resources, on two occasions—once about a male employee in December or January of 2012, and again on the last day that Paguada appeared for work. (Arellano Decl. Ex. 2, Paguada Dep. 38-40.)

Machado testified in her deposition that supervisor Anna Laura Resendiz would undo beds that she made then yell at her for not cleaning the room properly. (Arellano Decl. Ex. 3, Machado Dep. 27-30.) On two occasions, Machado worked with the American and Resendiz told the American "everything was fine" but yelled at Machado. (*Id.* at 29.) Machado further testified that Vasquez "was always calling [her] to the office to say that she heard things," and that Vasquez said that she could no longer put up with Machado because Machado was rebellious and did not listen. (*Id.* at 31.) Machado had the impression that Vasquez did not want her there. (*Id.*) On August 19, 2012, Vasquez told Machado as she was discussing disciplinary action, "That's it, you're going to be fired." (Arellano Decl. Ex. 3, Machado Dep. 44.)

Vasquez conducted meetings in her office, which sometimes lasted over an hour with Sierra during which Vasquez would tell her, "You are going to lose your job," and "I'm going to make sure you have a bad record," and "I will give you a bad reference." Sierra repeatedly complained about this conduct to Hinton but it continued. (Arellano Decl. Ex. 4, Sierra Dep. 34-38.)

Berrios testified in her deposition that Hispanic housekeeping employees were given a heavier workload than the Hindu and two American co-workers, and that the rooms were inspected more closely and more often than rooms cleaned by these co-workers. (Arellano Decl. Ex. 5, Berrios Dep. 56; Murray Aff., Ex. 1, Berrios Dep. 57-58; Def.'s PFOF

8

21.) The parties agree that, in the summer of 2012, the Hindu and two American employees were new workers whose employment ended prior to August 17, 2012. (Def.'s PFOF Nos. 7-9.)

Vasquez and Resendiz established a work rule that applied to plaintiffs and other Hispanic housekeepers that if they reported late to work, they would have to either perform a dance to Latin music in front of their coworkers gathered in a cafeteria or pay a $20 fine. Berrios was asked to dance twice but refused and also refused to pay the $20 fine. (Arellano Decl. Ex. 5, Berrios Dep. 87-8; Def.'s PFOF Nos. 24-27.) Paguada was late once. When she was told to dance to Latin music, she also refused to dance and refused to pay $20. (Murray Aff. Ex. 5, Paguada Dep. 31.) Tejeda was the only plaintiff who claimed she ever danced to Latin music. Tejeda was more than five minutes late twice during the last six months of her employment. (Murray Aff. Ex. 8, Tejeda Dep. 29.) The first time she was late, she was told she must dance to Latin music, which she did. (Murray Aff. Ex. 8, Tejeda Dep. 27-29.) The second time she was late, Tejeda refused to dance and refused to pay $20. (Murray Aff. Ex. 8, Tejeda Dep. 27-30.) Tejeda complained to Hinton about these dancing policies and Hinton said that she would speak to Vasquez (Arellano Decl. Ex. 1, Tejeda Dep. 55.)

When a Hispanic employee danced, the supervisors and non-Hispanic employees watched, laughed, and took videos. (Arellano Decl. Ex. 5, Berrios Dep. 89-90.) Berrios testified that she was told that everyone must dance if they refused; however, she also testified that no one danced when she refused. (Arellano Decl. Ex. 5, Berrios Dep. 92-94.) No non-Hispanic employee was ever asked to perform the dance to Latin music. (Arellano Decl. Ex. 5, Berrios Dep. 80; Ex. 1, Tejeda Dep. 27.) Berrios also testified that on one

9

Halloween, one Christmas and one other occasion all of the room attendants dressed up and danced.  (Arellano Decl. Ex. 5, Berrios Dep. 94.)

In the summer of 2012, some employees used Marcus Hotels' Confidential Line to complain about the treatment of housekeeping employees at the Madison Hilton.  For example, on July 26, 2012, Marcus Hotels received a call on its Confidential Line from a cook named Martha.[2]  (Murray Aff. Ex. 18; Murray Aff. Ex. 3, Kohler Dep. 22; 82.)  Martha complained about the way Vasquez treated employees in the Housekeeping Department. (Murray Aff. Ex. 3, Kohler Dep. 30.)  According to Martha, Vasquez spoke to these employees poorly, yelled at them, and was disrespectful.  (Murray Aff. Ex. 3, Kohler Dep. 31:17-23.)

Marcus Hotels  received other complaints on its Confidential Line from current and former employees who generally stated they were unhappy with the way Vasquez supervised them.  (Murray Aff. Ex. 3, Kohler Dep. 32-33.)  One former employee complained that Vasquez had yelled at him.  (Murray Aff. Ex. 3, Kohler Dep. 94-95.)

Berrios called the Confidential Line twice during the summer of 2012.  (Murray Aff. Ex. 1, Berrios Dep. 49; 52; 103-104.)  Each time she left a message complaining of her treatment by Resendiz, and harassment by Hector Cristino, a former co-worker.  (Murray Aff. Ex. 1, Berrios Dep. 49-52.)  Cristino's employment had ended on or about July 3, 2012. (Murray Aff. Ex. 19; Murray Aff. Ex. 1, Berrios Dep. 53, 64-65; Murray Aff. Ex. 5, Paguada Dep. 42.)

_____

[2]Defendant's exhibit 18 is the phone log identifying the caller as Marta.  The deposition testimony refers to the complaints of a woman named Martha.

10

Sierra called Marcus's Confidential Line once in August of 2012. (Murray Aff. Ex. 7, Sierra Dep. 39.) She did not give her name, but lodged a general complaint about her treatment by Vasquez. (Murray Aff. Ex. 7, Sierra Dep. 39-40.) On the other hand, Tejeda called the Confidential Line twice in 2012. (Murray Aff. Ex. 8, Tejeda Dep. 57-58.) However, she did not speak with anyone or leave a message. (Murray Aff. Ex. 8, Tejeda Dep. 57.) Because of the number of complaints and the fact that most of the complaining employees spoke Spanish, Marcus Hotels decided to meet with the Housekeeping employees at the Madison Hilton. (Murray Aff. Ex. 3, Kohler Dep. 34.)

Before scheduling the meeting, Michael Kohler, Senior Counsel for the Marcus Corporation and a Divisional Director of Human Resources for Marcus Hotels, discussed the idea with Martha who agreed the proposed meeting was a good idea. (Murray Aff. Ex. 3, Kohler Dep. 115-116.) Afterward, on August 22, 2012, the non-supervisory employees in the Housekeeping Department of the Madison Hilton met with Kohler, Keith Halfmann, the Vice President of Operations responsible for the Madison Hilton, and Sonia Saenz, a bilingual human resources employee from the Madison Sheraton. (Murray Aff. Ex. 1, Berrios Dep. 45-46; 48; Murray Aff. Ex. 3, Kohler Dep. 45; 46; Murray Aff. Ex. 4, Machado Dep. 19; Murray Aff. Ex. 5, Paguada Dep. 27-28.) Kohler explained the meeting was being held because of complaints Marcus Hotels had received on its Confidential Line. (Murray Aff. Ex. 1, Berrios Dep. 49:4-8.) Kohler and Halfmann wanted to understand employees' concerns. (Murray Aff. Ex. 1, Berrios Dep. 55-56.)

During the August 22, 2012, meeting, employees generally complained that Vasquez was disrespectful and condescending toward them; that she was insensitive to their requests for time off; that they frequently did not have all supplies they needed to do

their jobs; and that Vasquez favored Resendiz, one of the supervisors. (Murray Aff. Ex. 3, Kohler Dep. 50-51.) Some Hispanic housekeeping employees complained that they had been given a heavier workload than the Hindu and two American co-workers, and that their rooms were inspected more often and more closely than these co-workers. (Murray Aff. Ex. 1, Berrios Dep. 56-58, 80; Murray Aff. Ex. 4, Machado Dep. 28.) Some employees complained that one of the chemicals used to clean bathrooms caused headaches. (Murray Aff. Ex. 1, Berrios Dep. 78, 80-81.) Additionally, some Hispanic housekeeping employees complained that when they were late, they had been forced to dance to Latin music or pay $20. (Murray Aff. Ex. 1, Berrios Dep. 77-78; 80; Murray Aff. Ex. 5, Paguada Dep. 30-31.) They identified Vasquez, Resendiz and Annabelle, another supervisor, as the individuals who had forced them to do this. (Murray Aff. Ex. 8, Tejeda Dep. 31; Murray Aff. Ex. 5, Paguada Dep. 31; Murray Aff. Ex. 1, Berrios Dep. 90.)

Despite these complaints, the housekeeping employees stated that they enjoyed their jobs and liked the hotel. (Murray Aff. Ex. 7, Sierra Dep. 51; Murray Aff. Ex. 8, Tejeda Dep. 60.) However, they wanted Marcus to transfer Vasquez and Resendiz out of the Housekeeping Department of the Madison Hilton. (Murray Aff. Ex. 4, Machado Dep. 20, 58; Murray Aff. Ex. 7, Sierra Dep. 49; Murray Aff. Ex. 8, Tejeda Dep. 60-61; 70-71.) At the conclusion of the August 22 meeting, Kohler and Halfmann told the housekeeping employees that Marcus Hotels would investigate their complaints, and that a second meeting would be held after that investigation was complete. (Murray Aff. Ex. 4, Machado Dep. 20-21; Murray Aff. Ex. 8, Tejeda Dep. 60-61.)

After the August 22 meeting, Kohler, Halfmann, and Hinton met with Vasquez. (Murray Aff. Ex. 9, Vasquez Dep. 40-41.) They informed her of the complaints Marcus

12

Hotels had received.  (Murray Aff. Ex. 3, Kohler Dep. 96-98.)  Kohler told Vasquez these were serious issues.  (Murray Aff. Ex. 3, Kohler Dep. 49-50.)  He stated that either she was violating Marcus Hotels' policies and procedures, or her department was not responding to her management style and she would need to change that style to regain their trust. (Murray Aff. Ex. 3, Kohler Dep. 49-50.)

Kohler interviewed the three Housekeeping supervisors and the General Manager of the Madison Hilton.  (Murray Aff. Ex. 3, Kohler Dep. 40.)  Hinton, on the other hand, researched the chemicals used by the Housekeeping Department.  (Murray Aff. Ex. 2, Hinton Dep. 44.)  Hinton and Kohler reviewed Resendiz's discipline and attendance records to investigate whether Vasquez had favored Resendiz.  (Murray Aff. Ex. 2, Hinton Dep. 66-67.)

Kohler met with Vasquez a second time at her request.  (Murray Aff. Ex. 3, Kohler Dep. 47-49.)  Vasquez asked Kohler for suggestions on steps she could take to be a more effective manager.  (Murray Aff. Ex. 3, Kohler Dep. 50.)  Some of the complaints Marcus Hotels had received were harder to investigate.  For example, Tenzin, Steen and King's employment with Marcus Hotels ended prior to August 17, 2012.  (Murray Aff. Exs. 21-24; Murray Aff. Ex. 1, Berrios Dep. 73-76.)

The complaints of unpaid volunteer work relate to Marcus Corporation's 75th anniversary celebration in 2010.  (Murray Aff. Exs. 25-26; Murray Aff. Ex. 9, Vasquez Dep. 27, 66.)  As part of that celebration, the Marcus Corporation committed itself to providing 75,000 hours of volunteer service that year.  (Murray Aff. Exs. 25-26; Murray Aff. Ex. 1, Berrios Dep. 97.)  The Madison Hilton's Housekeeping Department volunteered to sort and box food for the Second Harvest Food Pantry.  (Murray Aff. Ex. 1, Berrios Dep. 97; Murray

13

Aff. Ex. 9, Vasquez Dep. 25-26.) This volunteer effort ended in 2010. (Murray Aff. Ex. 1, Berrios Dep. 101; Murray Aff. Ex. 9, Vasquez Dep. 25, 27.)

Marcus Hotels met with the housekeeping employees of the Marcus Hilton for a second time on August 31, 2012. (Murray Aff. Ex. 1, Berrios Dep. 102; Murray Aff. Ex. 4, Machado Dep. 19, 32; Murray Aff. Ex. 5, Paguada Dep. 43; Murray Aff. Ex. 8, Tejeda Dep. 62.) The participants in this meeting included the entire Housekeeping Department, Kohler, Halfmann, Saenz, Hinton, Vasquez and the three housekeeping supervisors. (Murray Aff. Ex. 1, Berrios Dep. 108, 109; Murray Aff. Ex. 3, Kohler Dep. 47.) Kohler and Halfmann told the housekeeping employees they had met with Vasquez and Resendiz, and that they had fully investigated their complaints. (Murray Aff. Ex. 1, Berrios Dep. 110; Murray Aff. Ex. 4, Machado Dep. 34; Murray Aff. Ex. 7, Sierra Dep. 57; Murray Aff. Ex. 9, Vasquez Dep. 48.) Kohler said that these allegations were found to be factually untrue. He further stated that Vasquez and Resendiz were excellent employees and they would be provided with an opportunity to grow within the company. Kohler stated that Vasquez and Resendiz had been instructed to treat all housekeeping employees with respect and to apply all work rules consistently. (Murray Aff. Ex. 4, Machado Dep. 34; Murray Aff. Ex. 7, Sierra Dep. 57; Pls.' PFOF 17.) Kohler and Halfmann stated that any future discipline of housekeeping employees must be reviewed and approved by the Human Resources Department. (Murray Aff. Ex. 1, Berrios Dep. 112.) Additionally, Marcus Hotels required Vasquez to take a behavioral study, and to review the results of that study with the Corporate Human Resources Director, so she could understand and improve her leadership style. (Murray Aff. Ex. 2, Hinton Dep. 70.) Kohler and Halfmann informed the housekeeping employees that an executive housekeeper from another hotel would be

14

coming to Madison to help Vasquez improve her relationship with them. (Murray Aff. Ex. 1, Berrios Dep. 111-112; Murray Aff. Ex. 4, Machado Dep. 36; Murray Aff. Ex. 7, Sierra Dep. 56; Murray Aff. Ex. 9, Vasquez Dep. 67-68.) Halfmann and Kohler told the housekeeping employees that Sonia Saenz would establish a regular schedule of Spanish speaking human resources hours at the Madison Hilton. (Murray Aff. Ex. 1, Berrios Dep. 111; Murray Aff. Ex. 4, Machado Dep. 35; Murray Aff. Ex. 8, Tejeda Dep. 67.) Further, based on Hinton's research, the Housekeeping Department was discontinuing the use of one of its chemical cleaners. (Murray Aff. Ex. 1, Berrios Dep. 112.) Finally, Kohler and Halfmann explained that Marcus Hotels was not going to fire or transfer Vasquez or Resendiz at that time. (Murray Aff. Ex. 4, Machado Dep. 36; Murray Aff. Ex. 7, Sierra Dep. 55.)

Kohler, Halfmann, Saenz and Hinton then met with Martha. (Murray Aff. Ex. 2, Hinton Dep. 52.) Kohler advised her of the actions Marcus Hotels was taking and thanked her for raising her concerns. (Murray Aff. Ex. 2, Hinton Dep. 54.) Martha also thanked Kohler. (Murray Aff. Ex. 2, Hinton Dep. 54.)

After the August 31 meeting, the plaintiffs returned to work and finished their shifts. (Murray Aff. Ex. 1, Berrios Dep. 43; 112; Murray Aff. Ex. 4, Machado Dep. 36; Murray Aff. Ex. 5, Paguada Dep. 48-49, 53; Murray Aff. Ex. 7, Sierra Dep. 58.) Sierra testified in her deposition that the plaintiffs and other housekeepers met in the elevator and believed that they were going to be fired "one by one." (Arellano Decl., Ex. 3, Sierra Dep. 59.) Annabel, a supervisor, told Berrios "I'm behind you because I know what you said [at the August 31 meeting] was true . . . . But I know Abigail [Vasquez] and Ana Laura [Resendiz], and I know that what you did is going to have repercussions on you. They're not gonna stay quiet, and they're going to seek their vengeance, and they're—and if—and they're going

15

to fire you . . . .  They're going to wait until these gentlemen [from Milwaukee] leave, and then they're going to come after you."  (Arellano Decl., Ex. 5, Berrios Dep. 117.)  Sierra testified they "went down in the elevator with Bridget from human resources" and told her that they were going to go because they "really wanted a change" and management "wasn't listening."  (*Id.*)  Plaintiffs walked off their jobs and went to the Human Resources office where they encountered Hinton and a Human Resources representative from Milwaukee who attended the meeting that day.  Berrios testified that she asked them to start with "changing them or transferring us over."  (Arellano Decl. Ex. 5, Berrios Dep. 117.)  After August 31, none of the plaintiffs reported to work; nor did they call in before the start of their shifts.  (Murray Aff., Exs. 12-15, 27; Murray Aff. Ex. 1, Berrios Dep. 126-127; Murray Aff. Ex. 7, Sierra Dep. 32.)

Each plaintiff received a copy of the Marcus Hotels Attendance Policy, which was printed in Spanish and English.  (Murray Aff. Exs. 10-11; Murray Aff. Ex. 4, Machado Dep. 16; Murray Aff. Ex. 5, Paguada Dep. 16-17; Murray Aff. Ex. 7, Sierra Dep. 30-31; Murray Aff. Ex. 1, Berrios Dep. 40.)  Under this Policy, a No Call/No Show occurs when an employee fails to call in before the start of her shift, and fails to report to work within 30 minutes of the start of that shift.  (Murray Aff. Ex. 11, p. 0097; Murray Aff. Ex. 1, Berrios Dep. 40-41; Murray Aff. Ex. 4, Machado Dep. 16; Murray Aff. Ex. 5, Paguada Dep. 17; Murray Aff. Ex. 7, Sierra Dep. 32; Murray Aff. Ex. 8, Tejeda Dep. 17.) Each of the plaintiffs understood that if she had three consecutive No Call/No Shows, her employment would end.  (Murray Aff. Ex. 11, p. 0098; Murray Aff. Ex. 1, Berrios Dep. 41; Murray Aff. Ex. 4, Machado Dep. 16; Murray Aff. Ex. 5, Paguada Dep. 17; Murray Aff. Ex. 7, Sierra Dep. 32; Murray Aff. Ex. 8, Tejeda Dep. 17.)

16

After the plaintiffs failed to report to work, Marcus Hotels tried to contact them to determine why they were not working. (Murray Aff. Ex. 3, Kohler Dep. 71.) Hinton and/or Saenz attempted to contact each of the plaintiffs. (Murray Aff. Ex. 3, Kohler Dep. 80.) Supervisors also left messages for Sierra and Tejeda asking them to return to work. (Murray Aff. Ex. 7, Sierra Dep. 74; Murray Aff. Ex. 8, Tejeda Dep. 70, 80.)

When the plaintiffs did not respond to these calls, and continued to incur No Call/No Shows, Marcus Hotels applied its Attendance Policy and ended the plaintiffs' employment. (Murray Aff. Ex. 3, Kohler Dep. 71-74; Murray Aff. Exs. 12-15, 27.) On or about September 6, 2012, Marcus mailed each of the plaintiffs notice that their employment had ended following three consecutive no-call/no shows. (Murray Aff. Exs. 12-15, 27.)

Kohler testified regarding the decision to apply the attendance policy as follows:

A.   Over Labor Day weekend, several individuals no-called/no-showed and did not show up for their scheduled shifts at the hotel in the housekeeping department. After trying to reach out to the individuals and determining either why they weren't coming in or if they would come in to talk and discuss with us, they continued to no-call/no-show. At that time, the hotel applied their attendance policy and terminated their employment under the attendance policy.

Q.   What, if any, input did you have in the decision to terminate those employees?

A.   I had – I was contacted, I believe, by Bridget Hinton who informed me that the housekeepers were not showing up. And in consultation with Bridget and myself and Keith Halfmann and the combination of Brian Johnson and Jason Havey, who were kind of acting as the general manager of the hotel at that time, we made the decision first that the attendance policy should be applied.

And then we secondly made a decision – or I told them to make the decision that an exception to the attendance policy should be granted and we should – even though they should have been terminated for three no-call/no-shows, we should open lines of communication and try to get them back in the hotel because we had set up plans in place to try to address issues that have been raised in the housekeeping department.

And before the majority of those could be implemented, people started no-calling and no-showing. We wanted them to have a

17

> chance to have this work. So we told them if they would come in, even if they had three no-call/no shows, we wouldn't follow the policy. But we had a date certain that they had to come in. And if they didn't, the attendance policy would be applied.

(Arellano Decl. Ex. 6, Kohler Dep. 72-73.)

On July 8, 2014, the plaintiffs filed complaints of discrimination with the Wisconsin Department of Workforce Development, Equal Rights Division. These complaints were cross-filed with the federal Equal Employment Opportunity Commission. (Doc 18, ¶ 8.) On February 5, 2015, the EEOC issued each of the plaintiffs a Notice of Right to Sue. (Doc. 18, ¶ 9.)

Plaintiffs filed their complaint on May 4, 2015. (Doc. 1.) In their complaint, plaintiffs claim that Marcus Hotels violated Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981 by discriminating against them on the basis of their race, gender and national origin, and by retaliating against them for complaining about unlawful discrimination culminating in their constructive discharge. (Doc. 1; Doc. 18, ¶ 11.)

CONCLUSIONS OF LAW

Having abandoned their Title VII claims and having disavowed any theory regarding a racially offensive/hostile work environment, plaintiffs are now arguing constructive discharge based on race and retaliation in violation of 42 U.S.C. § 1981. In their opposition brief, they clarify that they are asserting their working conditions were intolerable for the sole purpose of meeting the constructive discharge test. Essentially, plaintiffs are arguing that a reasonable jury could find that "the handwriting was on the wall" after the August 31st meeting in which the defendants decided not to grant their request to transfer their supervisors. Further, plaintiffs maintain that there is a mosaic of circumstantial evidence showing triable issues of the fact on the retaliation claim. Walking

18

off the job, according to plaintiffs, was a form of protected activity opposing "what they believed to be the inadequate measures [d]efendant announced at the August 31 meeting to address their complaints of discrimination." (Doc. 28 at 14-15.) Finally, plaintiffs believe that there is a genuine issue of material fact where Kohler conceded that he would waive the attendance policy if plaintiffs returned to work but then applied the policy after the deadline for returning had passed.

Before turning to the merits of the constructive discharge and retaliation claims, the court will first address the statute of limitations as it applies to plaintiffs' theories. The four-year "catch-all" statute of limitations codified in 28 U.S.C. § 1658 applies to claims arising under § 1981. *Dandy v. United Parcel Service, Inc.*, 388 F.3d 263, 269 (7th Cir. 2004)(citing *Jones v. R.R. Donnelly & Sons Co.,* 541 U.S. 369, 383, 124 S. Ct. 1836, 158 L. Ed. 2d 645 (2004)). As such, plaintiffs cannot proceed under their theories that they were forced to help sort and box food for Second Harvest Food Pantry during the Marcus Corporation's 75th anniversary in 2010. Any alleged violation taking place before May 4, 2011, is untimely.

Plaintiffs' first theory—constructive discharge—refers to the situation in which an employer, without firing an employee, makes working conditions so miserable that it drives the employee to quit. *See, e.g., Tutman v. WBBM–TV, Inc./CBS, Inc.*, 209 F.3d 1044, 1050 (7th Cir. 2000); *Simpson v. Borg–Warner Automotive, Inc.*, 196 F.3d 873, 877 (7th Cir.1999). Establishing constructive discharge is more difficult than establishing a hostile work environment because an employee is expected to remain employed while seeking redress. *Herron v. DaimlerChrysler Corp.*, 388 F.3d 293, 302 (7th Cir. 2004); *see also Thompson v. Mem'l Hosp. v. Carbondale,* 625 F.3d 394, 401-02 (7th Cir. 2010).

19

Employees who quit without giving their employer a reasonable chance to resolve a problem have not been constructively discharged. *Barker v. YMCA of Racine*, 18 Fed. Appx. 394 (7th Cir. 2001).

"A person who is told repeatedly that he is not wanted, has no future, and can't count on ever getting another raise would not be acting unreasonably if he decided that to remain would necessarily be inconsistent with even a minimal sense of self-respect, and therefore intolerable." *Hunt v. City of Markham, Ill.*, 219 F.3d 649 (7th Cir. 2000). The United States Supreme Court determined that a reasonable jury could find that a plaintiff had been constructively discharged where the plaintiff was sexually harassed, accused of misconduct, denied promotions, ignored when she voiced her complaints, and retaliated against by coworkers who handcuffed her and subjected her to interrogation. *Pa. State Police v. Suders*, 542 U.S. at 135–36, 124 S.Ct. 2342.

In *Simpson*, the Seventh Circuit discussed the type of intolerable working conditions that would give rise to a Title VII constructive discharge claim:

> We have characterized as intolerable working conditions that involved a series of escalating sexual remarks culminating in a physical assault and death threat. *Brooms v. Regal Tube Co.*, 881 F.2d 412, 423-24 (7th Cir.1989). Also intolerable was a work environment in which a manager held a gun to his subordinate's temple, took a picture and then circulated the picture at a company meeting, stating "this is what a nigger looks like with a gun to his head." *Taylor v. Western & Southern Life Ins. Co.*, 966 F.2d 1188, 1191, 1199 (7th Cir.1992). Intolerable, too, was a work environment where a subordinate's disputed sexual relationship with her supervisor led to a suicide attempt. *Snider v. Consolidation Coal Co.*, 973 F.2d 555, 557, 561 (7th Cir.1992).

196 F.3d at 877. At the same time, the Seventh Circuit has acknowledged that a number of "unpleasant and even embarrassing actions are tolerable and therefore insufficient to establish constructive discharge." *Id.* A work environment where plaintiffs were shunned,

20

received harassing phone calls, discovered their locker had been opened with papers missing, and were told their safety might be in jeopardy was unpleasant but not intolerable. *Drake v. Minnesota Mining & Mfg. Co.,* 134 F.3d 878, 886 (7th Cir. 1998). "[B]oorish" behavior by coworkers was insufficient for constructive discharge in *Lindale v. Tokheim Corp.*, 145 F.3d 953, 956 (7th Cir. 1998). Further, e-mails that implied termination, a poor performance appraisal, and shunning by supervisors were not the type of "egregious behavior, such as actual or threatened physical violence," supporting a constructive discharge claim. *Barker,* 18 Fed. Appx. at 399.

Hence, to meet their burden, plaintiffs needed to come forward with some evidence that their working conditions were objectively intolerable. Plaintiffs assert that "there is little question Vasquez and Resendiz made their working conditions intolerable based on their discriminatory double standards for Hispanic employees and non-Hispanic employees." (Doc. 28 at 2.) However, the evidence in the record is limited to a reference to one Hindu male and two American female coworkers. Plaintiffs did not identify the race or ethnicity of these individuals. Regardless, these individuals were hired in July of 2012 and paired with more experienced members of the Housekeeping Department before their employment ended prior to August 17, 2012. Significantly, this record contains no admissible evidence of slurs or references to race, ethnicity, or national origin, or evidence of actual or threatened violence.

Instead, plaintiffs have proffered evidence establishing that the conditions under Vasquez and Resendiz were undoubtedly unpleasant. They often yelled, one plaintiff was forced to dance when she was late (the others refused to dance or pay a fine), they closely inspected the rooms cleaned by the plaintiffs, they assigned more rooms to the

21

plaintiffs than non-Hispanic employees, and Vasquez denied Paguada's request and the requests of other Hispanic employees while giving an American female a week off. Yet, when asked by defendant's representatives, plaintiffs stated they enjoyed their jobs and the Madison Hilton.

Plaintiffs walked off their jobs on the same day that Marcus announced the measures to address their complaints. These measures included review and approval of all discipline, a behavior study for Vasquez, training for Vasquez to improve employee relations, and a bilingual human resources representative in the hotel during established hours. Although plaintiffs wanted Vasquez and Resendiz transferred, they did not give Marcus an opportunity to implement remedial measures. As such, plaintiffs have failed to establish a genuine issue of material fact on their constructive discharge claim.

Even if plaintiffs had sufficient, admissible evidence, defendants have established that they are entitled to invoke the affirmative defense set forth in *Ellerth* and *Faragher*. The Supreme Court has framed the defense as follows:

> An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee. When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence, see Fed. Rule Civ. Proc. 8(c). The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. While proof that an employer had promulgated an antiharassment policy with complaint procedure is not necessary in every instance as a matter of law, the need for a stated policy suitable to the employment circumstances may appropriately be addressed in any case when litigating the first element of the defense. And while proof that an employee failed to fulfill the corresponding obligation of reasonable care to avoid harm is not limited to showing any unreasonable failure to use any complaint procedure provided by the employer, a demonstration of such

22

> failure will normally suffice to satisfy the employer's burden under the second element of the defense. No affirmative defense is available, however, when the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment.

*Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 765, 118 S. Ct. 2257, 141 L. Ed. 2d 633 (1998), and *Faragher v. City of Boca Raton*, 524 U.S. 775, 807-808, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1998). In *Faragher*, the Supreme Court noted that this approach appropriately held employers liable for certain specific misuses of supervisory authority; at the same time, however, it encourages all parties involved to take appropriate steps to avoid harm, consistent with the purposes of the statute. 524 U.S. at 805–06, 118 S.Ct. 2275. In both *Ellerth* and *Faragher*, the Supreme Court conditioned the availability of the affirmative defense on the absence of a tangible employment action. *See also Suders*, 542 U.S. at 143, 148–50 (holding that constructive discharge was not a "tangible employment action" within the meaning of *Ellerth* and *Faragher* unless it was precipitated by some official act of the enterprise for which it was a certainty that the harassing supervisor was "aided by the agency relation").

Defendant has proffered evidence establishing that it took reasonable care to prevent and correct the alleged harassment. The Associate Handbook includes a Harassment Free Workplace Policy, Open Door Policy, and the Confidential Line. It promises an investigation and protection from retaliation. The record establishes that plaintiffs used the Confidential Line in July of 2012. Further, defendant promptly investigated the claims and representatives including the Director of Human Resources and the Vice President of Operations met with current and former non-supervisory employees of the department. Also, plaintiffs voiced their concerns during the August 22,

23

2012, meeting, and Kohler, Halfmann, and Hinton subsequently interviewed the supervisors and the Madison Hilton's General Manager, reviewed Resendiz's discipline and attendance records to determine if she was favored by Vasquez, and researched the chemicals used by housekeeping. During the August 31, 2011, meeting, Kohler and others announced that Vasquez and Resendiz had been instructed to treat all housekeeping employees with respect and apply the rules consistently, a bilingual human resources employee from another hotel would establish a regular schedule of Spanish-speaking human resource hours at the Madison Hilton, any discipline of housekeeping employees must be reviewed and approved by the Human Resources Department, Vasquez would meet with the Corporate Human Resources Director to take a behavioral study so she could improve her leadership style, and an executive housekeeper from another hotel was coming to Madison to help Vasquez improve her relationship with the employees in the department. Nevertheless, plaintiffs walked off the job right after the meeting thereby depriving the defendant of an opportunity to implement the corrective measures.

Plaintiffs respond that the affirmative defense does not apply because their resignation was the result of a tangible employment action—the constructive discharge. However, the Supreme Court in *Suders* explained that a constructive discharge may or may not involve official action by the employer. 542 U.S. at 143, 148–50. Harassment so intolerable as to cause a resignation may be "effected through co-worker conduct, unofficial supervisory conduct, or official company acts." *Id.* at 148. As a result, the Supreme Court held that the Third Circuit Court of Appeals erred in holding that *Ellerth* and *Faragher* are never available in constructive discharge cases. *Id.* at 152.

24

In the case at bar, there is no admissible evidence of an employer-sanctioned adverse action. Marcus conducted an investigation, heard plaintiffs' complaints, and communicated the remedial actions that would be implemented. Indeed, plaintiffs' evidence suggests that their decision to walk off their jobs was motivated by something other than an official action of the employer. Plaintiffs cite to Berrios's deposition testimony that Annabel told her that Vasquez and Resendiz will "wait until these gentlemen [from Milwaukee] leave and then they're going to come after you." Hence, it was not an official action taken by the defendant but rather a belief that Vasquez and Resendiz would take action against them without Marcus' knowledge. To the extent plaintiffs feared some action, Marcus had announced that any disciplinary action must be reviewed by Human Resources prior to implementation. Therefore, even if plaintiffs could create a genuine issue of material fact on the elements of a constructive discharge claim, it would be barred by the *Ellerth/Faragher* affirmative defense.

As a final matter, plaintiffs in their opposition brief argue that they were retaliated against for complaining about discriminatory working conditions on the Confidential Line and during the August 22, 2012, meeting. They also assert that their decision to walk off the job was a statutorily protected activity.

The United States Supreme Court has determined that plaintiffs may bring a retaliation claim under § 1981, which prohibits racial discrimination in making and enforcing contracts. *CBOSCS West, Inc. v. Humphries*, 553 U.S. 442, 128 S. Ct. 1951, 1954-55, 170 L. Ed. 2d 864 (2008). The court applies the same prima facie elements to retaliation claims under Title VII and § 1981. *Stephens v. Erickson*, 569 F.3d 779, 786 (7th Cir. 2009). Accordingly, to overcome the summary judgment motion, plaintiffs may proceed under the

25

direct or indirect method of proof. *Humphries v. CBOCS West, Inc.,* 474 F.3d 387, 404 (7th Cir. 2007).

Plaintiffs have chosen to proceed under the direct method, and therefore must present evidence of (1) a statutorily protected activity; (2) a materially adverse action taken by the employer; and (3) a causal connection between the two. *Id.* This direct route requires a "smoking gun"—an admission of discriminatory intent—or circumstantial evidence of retaliatory intent. *Carter v. Chicago State University*, 778 F.3d 651, 657 (7th Cir. 2015). On the other hand, pieces of circumstantial evidence may be combined to support an inference of discriminatory intent. This circumstantial evidence may include "(1) suspicious timing, ambiguous statements and other bits and pieces from which an inference of retaliatory intent might be drawn; (2) evidence that similarly situated employees were treated differently; and (3) evidence that the employer offered a pretextual reason for an adverse employment action." *Jajeh v. County of Cook,* 678 F.3d 560, 570 (7th Cir. 2012).

Plaintiffs assert that there are triable issues of fact regarding the first and third forms of circumstantial evidence. The complaints of discriminatory treatment that plaintiffs voiced during the August 22 and 31 meetings are protected activities. The mosaic arises because defendants have the right to walk off their jobs to protest the "inadequate measures announced at the August 31 meeting to address their complaints of discrimination." (Doc. 28 at 14-15.) In addition, Kohler acknowledged he was giving plaintiffs some flexibility in the attendance policy to allow them to return to work. As such, plaintiffs argue that defendant cannot change its mind and punish them "when it felt the impact of their lawful strike." (Doc. 28 at 16.)

26

There is no dispute that plaintiffs engaged in protected activity when complaining about their treatment. However, plaintiffs walked off their job and never called in before their shifts. The Attendance Policy in the record is unambiguous. Three no-call/no-shows results in termination. Plaintiffs were instructed to return Marcus's calls, but never responded to Marcus's multiple attempts to communicate with them. The undisputed evidence in the record documents multiple attempts to reach plaintiffs at multiple phone numbers. Marcus did not mail plaintiffs their termination notices until September 6, 2016, and Marcus's unsuccessful attempts to communicate with plaintiffs does not waive their right to enforce their policy. Moreover, the deposition testimony cited by plaintiffs must be viewed in its entirety. Kohler testified that he was willing to make an exception to the policy "to get them back in the hotel" because Marcus had plans to address the issues that had been raised. However, Kohler added that Marcus would not apply its Attendance Policy if plaintiffs came in but Marcus had a "date certain" by which plaintiffs needed to come in or the Attendance Policy would be applied. Therefore, plaintiffs have not created a genuine issue of material fact on the retaliation claim. Now, therefore,

IT IS ORDERED that defendants' motion for summary judgment is granted.

IT IS FURTHER ORDERED that this case is dismissed.

Dated at Milwaukee, Wisconsin, this 15th day of March, 2016.

BY THE COURT

/s/ C.N. Clevert, Jr.
C.N. CLEVERT, JR.
U.S. DISTRICT JUDGE